UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

ANTHONY J. GEER,

    Plaintiff,

v.

ROBERT DEAN, *Warden*,
JOHN DOE, *Lieutenant*,
JOHN DOE, *Intelligence Officer*,
SGT. TRACY TAYLOR and
SGT. IWILL MASON,

    Defendants.

Civil Action No. 24-0693-TDC

**MEMORANDUM OPINION**

Plaintiff Anthony J. Geer, an inmate previously confined at the Jessup Correctional Institution ("JCI") and the Patuxent Institution ("Patuxent"), both located in Jessup, Maryland, has filed this civil action pursuant to 42 U.S.C. § 1983 ("§ 1983") in which he alleges that Defendants failed to protect him from violent attacks by rival gang members and then failed to ensure that he received prompt and adequate medical care. Defendants Warden Robert Dean, Sergeant Tracy Taylor, and Sergeant Iwill Mason have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. In opposing the Motion, Geer also seeks summary judgment in his favor. Having reviewed the submitted materials, the Court finds no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion will be GRANTED, Geer's Motion will be DENIED, and the claims against the remaining, unserved defendants will be DISMISSED.

## BACKGROUND

On October 25, 2022, Geer arrived at JCI and was interviewed about his gang affiliations by an unnamed correctional official referred to by Geer as Defendant John Doe Intelligence Officer. Geer stated that he was an active member of the Dead Man Incorporated ("DMI") gang, and photographs were taken of all of his tattoos. According to Geer, DMI was at war with another gang known as Dead Man United ("DMU"), and members of the two organizations could not be anywhere near each other without violence erupting. He asserts that, in 2016 or 2017, a top ranking DMI leader was killed at JCI by DMU members.

At JCI, Geer was assigned to a cell in the A-Building and given a job on the A-Tier as a tier worker. According to Geer, A-Tier is a "highly secure tier" where inmates are kept inside their cells, and only inmates with "special security clearance" could work there. Compl. ¶ 9, ECF No. 1. As a tier worker, Geer's duties included, along with another worker, passing out meals to inmates in their cells as well as cleaning the tier.

Geer alleges that in March 2023, there was a fight between "DMU and correctional officers." *Id.* ¶ 10. After that incident, an unnamed lieutenant, referred to by Geer as Defendant Lieutenant John Doe, allegedly told Geer that he was lucky he was a good worker, or he would be in segregation with all of his "puppy-brothers." *Id.* Shortly thereafter, Officer Johnson, a correctional officer, warned Geer to watch his back because he was not supposed to be working on A-Tier, and there was a lot of talk about him on the compound. When Geer told Lt. John Doe about Officer Johnson's remarks, Lt. John Doe told him that he should be sent to segregation because it would make her job easier, but that he would not be sent there because he was a good worker. Geer further alleges that he heard Defendant Sergeant Iwill Mason wonder aloud how long Geer would "last in [general] population," and he heard Defendant Sergeant Tracy Taylor

remark numerous times that Geer should not be working on the A-Tier and that he should be thanking her for not sending him to the lock-up building. *Id.* ¶ 11.

## I. The JCI Assault

The parties agree that on April 1, 2023, Geer was assaulted by another inmate in or near the A-Building. According to Geer, he was let out of his cell at approximately 5:00 a.m. to pass out breakfast trays to inmates on A-Tier. At the same time, another inmate who was not a tier worker was released from his cell by a correctional officer, and this inmate immediately assaulted Geer with a homemade weapon.

According to a Serious Incident Report about the assault that was submitted by Lieutenant Aliu Olatunji, on April 1, 2023 at approximately 6:05 a.m., Corporal Adebowale Adeyanju called a 10-10 code inmate-on-inmate assault in the A-Building on the walkway. As reported by Lt. Olatunji, Geer and another inmate, Alton Cumbo, were both being escorted by Corporal Adeyanju to the front of the building to dump trash when Cumbo struck Geer with a closed fist at the back of his head, and the two men began fighting. Both inmates were given orders to cease fighting, and both complied. Both were escorted to the medical unit to be evaluated. Cumbo sustained no injuries and declined medical services.

According to medical records, Geer sustained multiple stab wounds to his head, as well as scratches to his left arm. Due to the trauma to his head, Geer was sent to the University of Maryland Medical Center ("UMMC") Shock Trauma Unit by ambulance at 8:25 a.m. on the morning of the assault. Geer, however, alleges that he was denied necessary medical services because after his return to JCI, Defendants refused to take him back to the hospital for follow-up care "within the time prescribed by [his] treating physician from UMMC shock-trauma hospital."

3

*Id.* ¶ 21. Geer asserts that he has endured other unspecified physical injuries as a result of that failure for which he now requires continuing medical "assessment and care." *Id.*

After Geer returned to JCI from UMMC, he was placed in the B-Building. Geer alleges that while he was in the shower, Defendant Warden Robert Dean interviewed him about the incident and asked him what he could do to make him whole. Geer asserts that during this discussion, Warden Dean recognized him and admitted to knowing him to be a DMI gang member from when Geer was at Maryland Correctional Institution–Jessup ("MCIJ") from 2020 to 2021 and Warden Dean was the Chief of Security at MCIJ. In a declaration, Warden Dean has denied having a conversation with Geer about his gang affiliation. He also denies that he ever received any correspondence from Geer or anyone else notifying him of a potential threat to Geer's safety prior to the April 1, 2023 assault.

Similarly, Sgt. Mason and Sgt. Taylor have submitted declarations in which they assert that they had no knowledge of any threats to Geer's safety prior to April 1, 2023. Sgt. Mason and Sgt. Taylor also state in their declarations that they were not working at JCI on April 1, 2023.

## II. The IID Investigation

The April 1, 2023 incident prompted an investigation by the Internal Investigation Division ("IID") of the Maryland Department of Public Safety and Correctional Services. During a recorded interview pursuant to that investigation, Geer asserted that while he was the tier worker for the A-Building's "A wing," "an officer accidentally released the incorrect tier worker for" the A-Building's "B wing." IID Report at 5, Mot. Ex. C, ECF No. 15-5. When asked if he had any prior issues with Cumbo, Geer stated that prior to the assault, Cumbo had asked him "again" to smuggle drugs from the kitchen onto the tier. *Id.* Geer stated that he and Cumbo had exited the A-Building and walked out toward the trash cans without incident, but that once they reached the

trash cans, Cumbo attacked him from behind. Geer stated that Cumbo had two weapons, one attached to each of his hands. Although Geer claimed that Cumbo referenced DMI during the attack, when asked by the interviewer whether he was a member of DMI, Geer denied any affiliation with DMI.

During the interview, Geer acknowledged that he was transported by ambulance to an outside hospital following the assault, where he received a CT scan and an x-ray and had his wounds closed with "stitches and glue." *Id.* When asked if he had received follow-up care, Geer asserted he had not received any and that he had to remove the stitches himself. Geer also stated that he has experienced blurred vision and ringing in his ears since the assault.

As part of the IID investigation, the investigator, Detective Sergeant Angel Thompson, viewed a surveillance video of the area in which the assault took place and stated in a report that the video showed that on April 1, 2023 at 5:35 a.m., Geer and Cumbo exited the A-Building with folded boxes, went to the trash cans, and put the items in a trash can. At that point, Cumbo lunged at Geer. After they were out of view for a few seconds, Cumbo was seen moving his arm in an up-and-down motion. Geer then fell to the ground, and Cumbo continued to move his arm in an up-and-down motion until a correctional officer responded.

Detective Sergeant Thompson also reviewed a surveillance video of the interactions between Geer and Cumbo in the A-Building's lobby prior to the assault and stated in a report that the video shows that between 4:30 a.m. and 5:35 a.m., Geer and Cumbo were working to separate breakfast trays prior to distribution, and that at 5:35 a.m., Cumbo removed some brown boxes from a trash can and handed some of them to Geer before both men walked toward the A-Building door.

As part of the investigation, Detective Sergeant Thompson also listened to phone calls between Geer and a woman named Dana, a phone call made by Geer's cellmate on the evening

following the assault, and phone calls made by Cumbo the day before and the day of the assault. In a call on March 31, 2023, Cumbo told someone that "he work[s] in the morning" and that "[w]hen I go, he be out there." IID Report at 7. Then, in a call on April 1, 2023 at 12:57 p.m., shortly after the assault, Cumbo stated that "I went out there and tried to holla at him. He was playing retarded. He said he already sent it." Id. Cumbo then said, "I did it in a good way . . . They thought we was just fist fighting. Until they got him and he was leaking bad." Id.

Separately, in a call on March 31, 2023 at 8:35 a.m., Geer discussed money with Dana, and when Dana said "We at $156 I still haven't sent the money," Geer responded, "Refund the $15. You should have some more coming in tonight." Id. at 6. Then, in a call after the assault, on April 1, 2023 at 7:16 p.m., Geer's cellmate told someone, "Dude alleged that he sent 130, but was only $15. When they went out to work, it happened. He said he was just going to refund him." Id. at 6–7. On April 3, 2023 at 5:23 p.m., Geer told Dana that "[I]t was a hit. A paid hit to get me off the tier." Id. at 6.

As a result of the IID investigation, criminal charges of second-degree assault were filed against Cumbo.

### III. The Patuxent Assault

After the JCI assault, and after Geer filed a formal grievance, JCI officials transferred Geer to Patuxent on April 19, 2023. Geer alleges that while he was at Patuxent, correctional officials determined that it was not safe for him to be there because Cumbo's brother was incarcerated there. Geer was then designated to be transferred to Western Correctional Institution ("WCI"). Geer asserts that on October 3, 2023, while he was leaving the Patuxent property room to be transferred to WCI, an inmate assaulted him with a knife, resulting in physical and emotional injuries. At the time, Geer was handcuffed with his hands behind his back. According to Geer "upon information

and belief," Patuxent correctional officers admitted that they let his assailant out of lock-up in order to placate DMU members who were angry about the presence of Geer, a member of DMI, at Patuxent. Compl. ¶ 20.

An IID investigation was conducted in relation to this incident. According to the IID report, on October 3, 2023, Geer was being escorted by Correctional Officer Anthony Okoma when an inmate, Liam Penn, pulled out a homemade weapon made from an altered pen and began swinging his right hand toward Geer. Okoma quickly grabbed Penn's right arm forcing him to the ground and retrieved the weapon. According to the report, no medical attention was given or required for any of the parties involved. The incident was not captured on surveillance video.

### IV. The Complaint

In the Complaint in this case, Geer asserts claims under the Eighth Amendment to the United States Constitution against Defendants Warden Dean, Sgt. Taylor, Sgt. Mason, Lt. John Doe, John Doe Intelligence Officer, and John Doe Correctional Officers, who are all sued in their individual capacities. First, in Count 1, Geer asserts that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from a serious risk of harm by leaving him in general population at JCI, where he sustained the assault by Cumbo, and by allowing him to be attacked at Patuxent. In Count 2, he alleges that Defendants violated his Eighth Amendment rights by failing to provide him with adequate medical care after the JCI assault, specifically, by failing to take him to the hospital for follow-up care as mandated by his treating physician. He also alleges that Warden Dean, John Doe Intelligence Officer, and the John Doe Correctional Officers are liable for negligence under Maryland law based on the assault at Patuxent, and that, in Count 3, Defendants are liable for intentional infliction of emotional distress. Geer seeks compensatory and punitive damages as well as declaratory relief.

## DISCUSSION

In their Motion, Defendants seek dismissal of the Complaint under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56. As grounds, Defendants argue that Geer has failed to exhaust administrative remedies, that he has failed to allege sufficient facts to establish supervisory liability as to certain defendants, and that he has failed to allege sufficient facts or provide sufficient evidence to support Eighth Amendment claims for failure to protect him from a threat to his health and safety and for deliberate indifference to a serious medical need, or to support the asserted state common law tort claims. Defendants also argue that they have immunity under the Eleventh Amendment to the Constitution from claims in their official capacities, statutory immunity from tort claims, and qualified immunity from the constitutional claims.

Where Defendants Lt. John Doe, John Doe Intelligence Officer, and the John Doe Correctional Officers ("the Unserved Defendants") have not been served, Defendants' Motion is filed only on behalf of Warden Dean, Sgt. Taylor, and Sgt. Mason. Nevertheless, where Geer is an inmate who is proceeding *in forma pauperis*, the Court reviews the claims against the Unserved Defendants alongside those of the other Defendants to assess whether Geer has stated a plausible claim for relief against the Unserved Defendants. *See* 28 U.S.C §§ 1915(e)(2), 1915A(b).

### I.   Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* A court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the

plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). A self-represented party's complaint must be construed liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, "liberal construction does not mean overlooking the pleading requirements under the Federal Rules of Civil Procedure." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020).

Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

Here, the notice requirement has been satisfied by the title of the Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002). In opposing the Motion, Geer has not asserted that he needs additional discovery in order to address the Motion. The Court

therefore will construe the Motion as a Motion for Summary Judgment as to the arguments requiring consideration of the exhibits.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## II.     Exhaustion of Administrative Remedies

As a threshold issue, Defendants assert that Geer's claims should be dismissed because he has failed to exhaust administrative remedies. Under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

*Id.* Inmates must exhaust administrative remedies before they bring any "suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion is mandatory and generally may not be excused unless the administrative procedure is not available. *See Ross v. Blake*, 578 U.S. 632, 642 (2016) (holding that an inmate "must exhaust available remedies, but need not exhaust unavailable ones"). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). In *Ross*, the United States Supreme Court identified three circumstances when an administrative remedy is unavailable. An administrative procedure is not available when officers are consistently unwilling or unable to provide relief to aggrieved inmates, the procedure is so opaque that it is practically incapable of use, or prison administrators actively thwart inmates from filing grievances. *Ross*, 578 U.S. at 643–44.

In Maryland prisons, for the type of grievance asserted by Geer, the Administrative Remedy Procedure ("ARP") is the administrative process that must be exhausted. *See generally* Md. Code Ann., Corr. Servs. §§ 10–201 to 10–210 (LexisNexis 2017); Md. Code Regs. 12.02.28.02(B)(1) (2022) (defining the ARP). First, a prisoner must file a grievance, known as an "ARP," with the warden of the prison within 30 days of the incident or when the prisoner gains knowledge of the injury giving rise to the complaint. *See* Md. Code Regs. 12.02.28.09(B), 12.02.28.05(D). Second, if the ARP is denied, a prisoner must file an appeal with the Commissioner of Correction within 30 days. Md. Code Regs. 12.02.28.14. If the appeal is denied, the prisoner must appeal within 30 days to the Inmate Grievance Office ("IGO"). *See* Md. Code Ann., Corr. Servs. § 10–206; Md. Code Regs. 12.02.28.18, 12.07.01.05. Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court. Md. Code Ann., Corr. Servs. § 10–210.

11

Defendants have submitted a declaration by a JCI official stating that there is no record that Geer submitted any ARPs relating to the April 1, 2023. However, the declaration does not address whether Geer filed any ARPs relating to other incidents underlying his claims, including the October 3, 2023 assault at Patuxent. In fact, Geer has submitted a copy of an ARP he filed in relation to the Patuxent assault, which states on its face that it was dismissed because the incident was the subject of an IID investigation. He has also submitted an October 2023 request to WCI in which he states that he had filed over five ARPs relating to the JCI assault.

By regulation, an ARP will be dismissed for procedural reasons if the incident underlying the ARP is "the basis of an investigation being conducted by" the IID. Md. Code Regs. 12.02.28.11(B). The United States Court of Appeals for the Fourth Circuit has held that because of this rule, when there is an IID investigation, "Maryland's scheme for administrative remedies is unavailable" pursuant to *Ross*, so the inmate cannot be required to exhaust the ARP process, and the PLRA's exhaustion requirement does not bar a civil action relating to that incident. *Younger v. Crowder*, 79 F.4th 373, 381 (4th Cir. 2023). Here, both the April 1, 2023 assault at JCI and the October 3, 2023 assault at Patuxent were investigated by the IID, such that the ARP process was effectively unavailable to Geer. Accordingly, the Court will not dismiss Geer's claims based on an alleged failure to exhaust administrative remedies.

### III.  Failure to Protect Claims

Geer's Eighth Amendment claim relating to the assault at JCI is based on an alleged failure to protect an inmate from a substantial risk to health and safety.

The Eighth Amendment to the United States Constitution protects prison inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. Though an Eighth Amendment claim could arise from a failure to protect an inmate from an assault by another inmate, "not every injury

suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or a substantial risk of such an injury. *Id.* (quoting *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014)). Subjectively, the prisoner must establish that the prison officials exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). Such deliberate indifference exists if there was a substantial risk of serious harm that was "longstanding, pervasive, well-documented or, noted by prison officials in the past," and the prison official in question had been exposed to that information but did not reasonably respond to it. *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016). Deliberate indifference also exists when prison officials were "aware that the plaintiff inmate face[d] a serious danger to his safety and they could avert the danger easily yet they fail[ed] to do so." *Id.* Where prison officials respond reasonably to the risk, they are not liable even if the harm was not ultimately averted. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation because the doctrine of *respondeat superior*, or vicarious liability, does not apply in § 1983 claims. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017). Thus, a defendant's liability under § 1983 generally can be established only if the defendant personally participated in the constitutional violation. *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018).

A defendant who is a supervisor may be held liable if the following conditions for supervisory liability are met: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Here, although Geer suffered an objectively serious injury, the record does not support the conclusion that Defendants are liable under this standard. Geer has asserted that he was a member of the DMI, that there generally was a risk of violence when DMI and DMU members interacted, and that most DMI members were in a segregation unit. Compl. ¶ 10. He has also asserted that he reported a comment that there was "a lot of talking about" him, *id.* ¶ 11, and that several of Defendants made comments wondering how long he would last in general population and suggesting that he should be in segregation instead of in the A-Building, including because it would make their jobs easier, but that he was allowed to remain there because he was a good worker.

These comments, which leave unclear whether the view that Geer and other DMI members should be placed in segregation was based on disciplinary reasons or for their own safety, do not alone establish that Defendants were aware that Geer faced a substantial risk of serious harm just by being present in the A-Building on the A-Tier. Indeed, other facts run counter to that conclusion. First, prior to the assault, he had remained in the A-Building for approximately six months, from October 2022 to April 2023, yet Geer has not identified any incident during that time period in which he was subjected to physical harm or the threat of such harm. Second, as Geer

stated in the Complaint, the A-tier "is a highly secure tier," where "inmates are kept [in] lockup in their cells," *id.* ¶ 9, so Geer typically did not actually interact with other inmates while performing his job. Third and most importantly, Geer has neither alleged nor provided evidence that he ever objected to being in general population or being present on and working in the A-Building and on the A-Tier. He never requested a transfer to another building or tier based on a fear that his safety was at risk. Typically, when a prisoner asserts a successful claim for a failure to protect him from other inmates, the prisoner has asked to be separated from the potential assailants, and the defendants ignore or do not act on that request. *See, e.g., Cox*, 828 F.3d at 237 (affirming the denial of summary judgment on a failure-to-protect claim where the plaintiff had repeatedly informed prison officials that he was being threatened and requested that he or the inmates he feared be transferred). Here, Geer never asked for such separation.

Moreover, the record evidence does not support the conclusion that Defendants were aware that Cumbo presented a serious risk of harm to Geer on April 1, 2023. Although Geer asserts that when Cumbo was released from his cell, he was not actually a tier worker, he does not claim that he was released by a correctional officer with the knowledge that Cumbo was a rival gang member who would likely attack Geer. Rather, in the IID interview, he did not claim that Cumbo was a DMU member and instead stated that he previously knew Cumbo as an inmate who had asked him to participate in drug smuggling within the prison. Significantly, the IID report, particularly the account of the surveillance video, showed that Cumbo actually worked with Geer for approximately one hour before the assault, and that Geer did not object to working alongside Cumbo based on safety concerns. Finally, the account of the recorded phone calls illustrates that Geer did not know that Cumbo posed a threat until he actually attacked Geer. Under these circumstances, and where Geer never asked to be transferred away from the A-Building for safety

reasons and did not notify Defendants or any other correctional officers that Cumbo posed a threat to his safety, the Court finds that the record does not support the conclusion that Defendants were aware that Geer faced a "substantial risk of serious harm" from Cumbo that they did not seek to address. *Cox*, 828 F.3d at 236. In particular, Warden Dean, Sgt. Mason, and Sgt. Taylor, were not even present in the A-Building that day and thus had no knowledge of whether Cumbo posed a threat, and there is no evidence that they had any knowledge that he was being released from his cell to work at the same time as Geer. The Motion will therefore be granted as to the claim relating to the JCI assault.

As for Geer's failure-to-protect claim relating to the October 3, 2023 Patuxent assault, Geer does not allege that any of Defendants, all of whom worked at JCI rather than Patuxent, had any personal participation in or even supervisory responsibility for that incident. The Motion will be granted as to this claim.

Finally, for the same reasons that the Court finds that Defendants' Motion will be granted, Geer's Motion for Summary Judgment will necessarily be denied as to the failure-to-protect claims.

### IV.    Medical Care Claim

As for Geer's claim that Defendants failed to provide him with adequate medical care, an Eighth Amendment claim relating to inadequate medical care requires that a plaintiff demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Such deliberate indifference requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241

16

(4th Cir. 2008). Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citations and internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Here, Geer acknowledges, and the medical records demonstrate, that shortly after the April 1, 2023 assault at JCI, he was sent to the JCI medical unit and then to UMMC's Shock Trauma Unit for treatment of his stab wounds. The record therefore does not support a claim of deliberate indifference to his medical needs at that point.

Geer appears to base his claim relating to medical care on his allegation that once he returned from UMMC to JCI, Defendants refused to take him to the hospital for follow-up treatment directed by his treating physician, including having his stitches removed after one week, and having an appointment with an ophthalmologist at UMMC after three weeks. This claim fails for two reasons. First, Geer has not alleged facts demonstrating that after he received his emergency treatment at UMMC and was returned to JCI, that his medical condition at that point was objectively serious, to the point that a failure to provide him with the unspecified follow-up care on the schedule provided by the physician presented an excessive risk to inmate health or safety. Second, even assuming that there was such a risk, Geer has not provided any allegations or evidence that any of Defendants were aware of that risk. Rather, there is no evidence that Defendants were made aware of the physician's instructions and had the responsibility to arrange for his transport to the hospital, but refused to do so. Notably, although Geer asserted in the Complaint that Sgt. Taylor, Sgt. Mason, and Lt. John Doe were "in charge of A-Building at JCI," and that the John Doe Correctional Officers were "working in A-building control panels," Compl. ¶¶ 4–7, as Geer has acknowledged, he was moved to the B-Building upon his return to JCI, so there is no basis to conclude that any of these defendants had such knowledge or had responsibility for such transport. Likewise, there is no basis to conclude that John Doe Intelligence Officer, whose role was to interview Geer about gang affiliations when he entered JCI, had such knowledge or responsibility. Finally, although Geer has asserted that he met with Warden Dean upon his return, he notably makes no allegations that Warden Dean was made aware of his need for transport to the hospital for follow-up care. Where Geer has neither alleged sufficient facts nor provided sufficient evidence to establish deliberative indifference to a serious medical need, the Motion will

be granted as to this claim. For the same reasons, Geer's Motion for Summary Judgment will be denied as to this claim.

## V.    State Law Claims

In addition to the federal constitutional claims, Geer alleges state law claims of negligence relating to the aftermath of the Patuxent assault and intentional infliction of emotional distress. Where the Court will dismiss Geer's federal claims, and Geer has not demonstrated diversity jurisdiction, the Court may decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3). Where this case remains at the early stages, the Court will decline to exercise such jurisdiction and will therefore dismiss the state law claims without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment will be GRANTED in that judgment will be entered in favor of Defendants Warden Dean, Sgt. Taylor, and Sgt. Mason on the federal claims in Counts and 1 and 2, and the remaining state law claims will be DISMISSED WITHOUT PREJUDICE. The claims against Defendants Lt. John Doe, John Doe Intelligence Officer, and the John Doe Correctional Officers will be DISMISSED pursuant to 28 U.S.C. § 1915A(b). Geer's Motion for Summary Judgment will be DENIED. A separate Order shall issue.

Date: September 16, 2025



THEODORE D. CHUANG
United States District Judge